USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _09/27/23_

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ALISON KENT-FRIEDMAN,

                    Plaintiff,

        - against -

NEW YORK STATE INSURANCE FUND, ET AL.

                    Defendants.

---

**18 Civ. 4422 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Alison Kent-Friedman ("Kent-Friedman") brought this employment discrimination and retaliation action against her former employer, the New York State Insurance Fund ("NYSIF"), and various individual NYSIF employees in their personal capacities (collectively the "Individual Defendants" and, together with NYSIF, "Defendants"). (See Dkt. No. 41.) Presently before the Court is Defendants' motion for summary judgment. (See Dkt. No. 152.) For the reasons stated below, the Court **GRANTS** the motion in part and **DENIES** it in part.

## I.   BACKGROUND

A.   NYSIF AND THE NEW YORK CIVIL SERVICE LAW

NYSIF is a state agency that provides workers' compensation, disability, and paid family leave insurance to employers in New York. (See Pl.'s Resp. to Defs.' Statement

of Material Facts Pursuant to Local Civ. R. 56.1, Dkt. No. 165 [hereinafter "Pl. 56.1 Resp."], ¶ 1.) The agency is managed by an executive director (the "NYSIF Executive Director" or "Executive Director"), a position the parties liken to a corporate chief executive officer. (See id. ¶ 26.) NYSIF is subject to the New York Civil Service Law, which sets forth requirements governing hiring and promotions applicable to New York state entities. (See id. ¶ 3.) All NYSIF employees occupy an approved Civil Service position, sometimes referred to as an "item." (See id. ¶ 4.) Although every position is associated with an approved Civil Service title, agencies like NYSIF have the discretion and flexibility to change an employee's functional role or office title within the agency so that it differs somewhat from the employee's official Civil Service designation. (See id. ¶ 5.)

Each position at NYSIF is classified within one of three categories: a competitive class position, a non-competitive class position, or an exempt class position. (See id. ¶ 7.) These classes are defined by the Civil Service Law. See N.Y. Civ. Serv. Law §§ 40-42, 44. Published schedules set forth competitive and non-competitive class employees' salaries. See id. §§ 130-31. Employees in the competitive class cannot be removed unless, after a hearing upon stated charges, they are shown to be incompetent or to have committed misconduct.

See id. § 75(1), (1)(a). Members of the exempt class do not enjoy this protection and are essentially at-will employees. (See Pl. 56.1 Resp. ¶ 12.)

When a position in the exempt class becomes available, NYSIF's practice is to identify a candidate and submit a form known as a "Request for Personnel Action" to the New York State Center for Recruitment and Public Service (the "Center for Recruitment"). (See Pl. 56.1 Resp. ¶ 18.) NYSIF's practice is to make a recommendation to the Center for Recruitment with respect to the salary for the exempt class position and await the Center for Recruitment's approval. (See id. ¶ 24.)

The parties dispute whether NYSIF can permanently appoint[1] people to exempt class positions and set their salaries without approval from the Center for Recruitment. (See id. ¶¶ 24, 82.) NYSIF's Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") deposition designee, Joseph Mullen ("Mullen"), testified that the Center for Recruitment has

---

[1] The parties use the word "permanent" in phrases such as "permanent appointee" and "permanent Assistant Director" to refer to a person who has been formally appointed to a position and to distinguish such a person from an employee who merely fills a role on a temporary or interim basis during a period when the position is formally vacant. (See, e.g., Pl. 56.1 Resp. ¶ 61.) The parties refer to the latter type of person as an "acting" employee, e.g., the "Acting Assistant Director." (See, e.g., id. ¶ 69.) The distinction usually arises after the retirement, departure, promotion, or transfer of someone who had been formally (or "permanently") appointed to a position. While NYSIF searches for that person's long-term (or "permanent") replacement, someone else often fills the departed employee's role in the interim and is referred to as occupying an "acting" position. Throughout this decision, the Court will use this terminology as the parties do.

final approval over hiring and salaries. (See Rule 30(b)(6) Deposition of Joseph Mullen, dated March 9, 2021, Dkt. No. 164-6 [hereinafter "Mullen 30(b)(6) Dep."], at 46:11-47:2, 58:23-59:13.) However, he also said he did "not believe that there are any written guidelines, rules, or regulations with respect to the Center for Recruitment and Public Service process for transactions involving exempt positions." (See id. at 146:21-147:2.) When Mullen was separately deposed in his personal capacity as an individual defendant, he said he was "not aware of any written rule" requiring that salaries for exempt class positions be submitted to the Center for Recruitment for approval. (See Deposition of Joseph Mullen, dated March 23, 2021, Dkt. No. 164-5 [hereinafter "Mullen Dep."], at 18:20-19:4.)

Because NYSIF is funded entirely by policyholder premiums and investment income, the agency does not need approval from the state Division of the Budget to appoint people to exempt class positions. (See Pl. 56.1 Resp. ¶¶ 2, 19.) Moreover, the Civil Service Law does not require that exempt class positions be publicly posted or that any formal canvass or search process be observed applicable to exempt positions. (See id. ¶ 21.)

NYSIF has a special investigations unit called the Division of Confidential Investigations ("DCI") whose primary

4

purpose is to prevent insurance fraud by policyholders and claimants. (See id. ¶¶ 13-14.) DCI is managed by a director (the "DCI Director" or "Director"), who in turn reports to NYSIF's executive leadership. (See id. ¶ 15.) The official Civil Service title associated with the DCI Director position is Director of Investigations, and the position is in the exempt class. (See id. ¶ 16.) In the past, DCI has also had an assistant director (the "Assistant DCI Director" or "Assistant Director"). (See id. ¶ 63.)

B.   THE INDIVIDUAL PARTIES

Defendant Eric Madoff ("Madoff") served as NYSIF Executive Director between January 2014 and March 2021. (See id. ¶ 26.) Defendant Peter Cusick ("Cusick") began working at NYSIF in October 2008 and served as NYSIF Deputy General Attorney between May 2010 and January 2022. (See id. ¶¶ 29, 32.) In approximately 2013, NYSIF leadership designated Cusick to oversee DCI. (See id. ¶ 34.)

Mullen began working at NYSIF in 1997, served as Director of Administration between 2006 and 2018, and eventually became Deputy Executive Director and Chief of Staff. (See id. ¶¶ 35-36). As Director of Administration, Mullen oversaw personnel, affirmative action, contracts administration, procurement, facilities, payroll, and labor relations. (See

id. ¶ 37.) Defendant William O'Brien ("O'Brien") was NYSIF's General Attorney from 2013 to 2019, functioning as NYSIF's general counsel and chief legal officer and reporting directly to the NYSIF Executive Director. (See id. ¶¶ 38-39.)

Defendant John Dormin ("Dormin") was DCI Director between September 2016 and May 2020, overseeing DCI operations and executing initiatives set forth by NYSIF leadership. (See id. ¶¶ 40-41.) Dormin reported to Cusick. (See id. ¶ 42.) Prior to joining NYSIF, Dormin was an assistant district attorney in Manhattan for fifteen years, an assistant attorney general on New York's Organized Crime Task Force for four years, and the executive director of the state Department of Labor's Office of Special Investigations for approximately nine years. (See id. ¶ 43.) Dormin testified that in the latter position, he supervised investigations into allegations of fraud against the Department of Labor and the Workers' Compensation Board. (See id. ¶ 46.)

Kent-Friedman began working at NYSIF in 1992 as an attorney. (See id. ¶ 50.) She was promoted to Senior Attorney and then, in approximately August 2001, to Associate Attorney. (See id. ¶ 51.) In late 2001, Kent-Friedman was again promoted, this time to Supervising Attorney, a competitive class position. (See id. ¶ 52.) She remained in

the Supervising Attorney line item until she voluntarily resigned from NYSIF in March 2020. (See id. ¶ 57.)

C.   KENT-FRIEDMAN'S SERVICE AS ACTING DCI DIRECTOR

Kent-Friedman was assigned in approximately 1998 to serve as legal counsel to DCI. (See id. ¶ 53.) On June 10, 2000, Phil DiSenso ("DiSenso") was permanently appointed as Assistant Director of DCI. (See id. ¶ 61.) While he was Assistant DCI Director, DiSenso's official Civil Service title was Chief of Investigations, and the position was in the exempt class. (See id.) His salary as Assistant Director in 2010 was $127,794. (See Defs.' Resp. to Pl.'s Statement of Material Facts Pursuant to Local Civ. R. 56.1, Dkt. No. 174 [hereinafter "Defs. 56.1 Resp."], ¶ 259.)

Effective August 5, 2010, DiSenso was promoted and permanently appointed as DCI Director. (See Pl. 56.1 Resp. ¶ 62.) There has not been a permanently appointed Assistant DCI Director since then, and the Chief of Investigations item remained unoccupied until approximately 2018, when NYSIF eliminated the functional Assistant DCI Director role altogether and used the Chief of Investigations item for a newly created Chief of Fraud Prevention position. (See id. ¶¶ 63-64, 174.)

DiSenso retired as DCI Director effective July 19, 2012. (See id. ¶ 65.) Kent-Friedman says she began during that summer to take on the role of DCI Director in an acting and informal capacity, at the request of NYSIF leadership. (See id. ¶ 67.)

Kent-Friedman testified that around this time, Cusick told her that she would eventually be permanently appointed to either Director or Assistant Director of DCI. (See Depositions of Plaintiff, dated Apr. 29, 2021, and May 10, 2021, Dkt. No. 164-1 [hereinafter "Pl. Dep."], at 63:25–64:7, 66:24–67:14, 249:14–251:4.) Cusick denies making this statement to Kent-Friedman. (See Deposition of Peter Cusick, dated Apr. 15, 2021, Dkt. No. 164-3 [hereinafter "Cusick Dep."], at 82:17–83:16.)[2]

NYSIF made Kent-Friedman's interim role explicit about a year later, when NYSIF's Acting Executive Director formally announced in an email, dated June 20, 2013, that Kent-Friedman would serve as Acting DCI Director and that NYSIF was working to fill the DCI Director position on a more permanent basis. (See Pl. 56.1 Resp. ¶ 68.) Formally, Kent-Friedman remained in her Civil Service role as Supervising Attorney, a

---

[2] Kent-Friedman also testified that she relied on Cusick's statement in deciding to continue serving as Acting Director and, later, as Acting Assistant Director. (See Pl. Dep. at 63:25–64:7, 249:14–250:15.)

competitive class position. (See id. ¶ 71.) Kent-Friedman
testified that while she served as Acting DCI Director, she
continued to perform her duties as counsel to DCI, with
support from another DCI attorney, Anthony Obiajulu
("Obiajulu"), who functioned as Acting Supervising Attorney.
(See id. ¶¶ 69, 88; Pl. Dep. at 294:21-295:4.)

Meanwhile, NYSIF was seeking applicants for the
permanent DCI Director position. NYSIF had advertised the
position in a "Vacancy Notice" dated May 1, 2013. (See State
Insurance Fund Vacancy Notice, Dkt. No. 164-30 [hereinafter
"Vacancy Notice"].)

Kent-Friedman applied for the job, but the position went
to George Tidona ("Tidona"), who was permanently appointed to
the position in February 2014. (See Pl. 56.1 Resp. ¶ 70; NYSIF
Position Statement Regarding EEOC Charge No. 520-2017-01853,
Dkt. No. 164-12 [hereinafter "EEOC Position Statement"], at
8-10.) When asked why he recommended the appointment of
Tidona, Cusick remarked upon Tidona's prior experience
investigating and prosecuting white collar crime and added,
"So when we reviewed his resume and I spoke with Mr. Tidona,
we thought this is the kind of guy that we want to see at the
top of DCI." (Dkt. No. 164-8 at 161:4-7.)[3] Accordingly, Kent-

_____

[3] Cusick made this statement on July 13, 2017, while being deposed as a
nonparty witness in another case. See Emengo v. Stark, 15 Civ. 9916
(S.D.N.Y. Feb. 12, 2018), ECF No. 71-10. Kent-Friedman's counsel attached

Friedman was no longer Acting DCI Director as of approximately February 2014. (See Pl. 56.1 Resp. ¶ 70.)

D.   KENT-FRIEDMAN'S SERVICE AS ACTING ASSISTANT DIRECTOR

After Tidona arrived, Kent-Friedman worked as the Acting Assistant DCI Director. (See id. ¶ 75; Defs. 56.1 Resp. ¶ 270.)[4] Again, she formally held the Supervising Attorney job and thus remained in the competitive class under the Civil Service Law, and she continued to perform duties associated with the Supervising Attorney role. (See Pl. 56.1 Resp. ¶¶ 77-

_____

an excerpt from the deposition transcript to his declaration in opposition to Defendants' motion for summary judgment. (See Dkt. No. 164 ¶ 11.) Defendants admit that Cusick testified as quoted but object to its inclusion in the summary judgment record on the ground that Kent-Friedman did not identify or produce the transcript in discovery. (See Defs. 56.1 Resp. ¶ 268.)

The Court overrules the objection, as Defendants had an opportunity to respond on reply, the statement was made under penalty of perjury, and the statement would be admissible at trial since Cusick is a party in this case. See Fed. R. Evid. 801(d)(2)(A) (exempting an opposing party's statement from the definition of hearsay). The Court notes that Cusick's statement in the Emengo deposition was made in answer to the question, "Can you tell me the reasons why you and Mr. Sammons recommended Mr. Tidona?" (Dkt. No. 164-8 at 160:8-10.) Mr. Sammons is not party to this action, so the statement does not necessarily implicate the other Individual Defendants.

[4] Kent-Friedman had previously been considered in May 2013 for permanent appointment as Assistant DCI Director. (See Pl. 56.1 Resp. ¶ 92.) Mullen submitted a Request for Personnel Action form (the "May 2013 Request") to the Center for Recruitment, seeking approval to permanently appoint Kent-Friedman as such. (See id. ¶ 93.) NYSIF later withdrew the May 2013 Request. (See Email, dated July 16, 2013, from Dorothy Carey, Dkt. No. 153-16.) When asked why NYSIF withdrew the May 2013 Request, Mullen testified that "we were directed to do a recruitment for the . . . position," but he could not recall who gave that direction or whether the person who gave the direction was within or outside of NYSIF. (See Mullen Dep. at 51:11-52:6; see also Cusick Dep. at 85:7-86:9.) In his 30(b)(6) deposition, Mullen testified that he was not aware of any documents that would show that the Center for Recruitment did not approve the May 2013 Request. (See Mullen 30(b)(6) Dep. at 118:18-119:24.)

78.) But, as far as she knew, Kent-Friedman also performed all the duties that DiSenso had performed while he was the permanently appointed Assistant DCI Director, according to her deposition testimony. (See Pl. Dep. at 295:21-297:12.)

In May 2014, Kent-Friedman wrote to Cusick, Tidona, and others to memorialize a conversation in which, according to Kent-Friedman, Tidona told her she was "still 'in the running'" to be permanently appointed as Assistant Director. (See Email, dated May 16, 2014, from Alison Kent-Friedman, Dkt. No. 164-25 [hereinafter "May 2014 Email"].)[5] Kent-Friedman's salary was $117,260 in 2014; it increased to $121,997 in 2015 and to $132,054 in 2017. (See Defs. 56.1 Resp. ¶ 258.)

During the summer of 2015, NYSIF publicly posted for the Assistant DCI Director job, and Kent-Friedman applied for it. (See Pl. 56.1 Resp. ¶ 110; Defs. 56.1 Resp. ¶ 280.) However, the position was not permanently filled at that time nor at any point after that. (See Pl. 56.1 Resp. ¶ 111.) This inaction was not for lack of funding, as there is evidence showing that NYSIF did have the money to hire an Assistant DCI Director. (See Defs. 56.1 Resp. ¶ 271.)

---

[5] Defendants object that Tidona's statement is hearsay, but it would be admissible at trial to show the effect the statement had on Kent-Friedman, regardless of whether it was true. See United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay.").

E.   <u>NYSIF'S DECISION TO HIRE DORMIN</u>

Madoff testified that after he started in the Executive Director job in 2014, he began to make significant changes across various NYSIF departments. (<u>See</u> Pl. 56.1 Resp. ¶¶ 96–99.) For example, he wanted DCI to focus on preventing fraud rather than on building cases to be referred for criminal prosecution. (<u>See</u> <u>id.</u> ¶ 101.) He thus oversaw a shift away from "going after arrests" and toward "cut[ting] off paying benefits to claimants who we thought were claiming benefits fraudulently, and to do that . . . via the Workers' Comp[ensation] Board." (<u>See</u> Deposition of Eric Madoff, dated Apr. 7, 2021, Dkt. No. 164-2 [hereinafter "Madoff Dep."], at 153:25–154:20.) Madoff also testified that he wanted to make DCI "much more data-focused and data-aware." (<u>See</u> <u>id.</u> at 76:15–20.) Kent-Friedman did not embrace the new vision for DCI's direction, according to Madoff. (<u>See</u> <u>id.</u> at 78:23–79:9.)

Madoff further testified that, over time, he determined that Tidona did not have the ability to embrace the data-focused strategy. (<u>See</u> Pl. 56.1 Resp. ¶ 113.) Madoff said he had also been made aware of internal and external complaints about DCI, including a complaint he received during a conversation with then-New York Inspector General Catherine Leahy Scott ("Leahy Scott") about DCI's lack of cooperation

with her office. (See Madoff Dep. at 90:7–9; Pl. 56.1 Resp. ¶¶ 115, 120.) As a result of these issues, according to Madoff, Madoff and other NYSIF executives decided to replace Tidona as DCI Director. (See Pl. 56.1 Resp. ¶ 122.)

Madoff testified that during his conversation with Leahy Scott, Leahy Scott identified Dormin as someone who would be capable of leading DCI. (See id. ¶ 126.)[6] NYSIF did not publicly post for the DCI Director job, which is an exempt class position; the Civil Service Law did not require NYSIF to do so. (See Pl. 56.1 Resp. ¶¶ 123–24.) Madoff and other NYSIF executives interviewed Dormin and decided he was the right candidate for the job. (See id. ¶¶ 127, 131.) Madoff testified that Dormin was chosen for the position because, among other things, he had management experience at the state Department of Labor and was supportive of the data-driven approach that Madoff was pushing. (See Madoff Dep. at 94:20– 96:7.)

On a "Request for Personnel Action" form, Mullen requested approval to appoint Dormin to the DCI Director job, writing that Dormin "interviewed well and possesses the skills, abilities, and experience necessary for this

---

[6] The statements purportedly made by Leahy Scott to Madoff would be admissible at trial to show their effect on Madoff rather than for their truth. Dupree, 706 F.3d at 136.

position." (See Request for Personnel Action Regarding John Dormin, dated July 11, 2016, Dkt. No. 164-13 [hereinafter "Dormin Personnel Action Form"].) Dormin started as DCI Director in September 2016. (See Pl. 56.1 Resp. ¶ 132.)

After Dormin became DCI Director, he assigned Kent-Friedman to supervise the staff and investigators in DCI's Melville office. (See id. ¶ 56.) Kent-Friedman had, since 2014, been splitting her time between NYSIF offices in Manhattan and Melville. (See id. ¶ 55.) She had a private office in both locations. (See Defs. 56.1 Resp. ¶ 305.)

F.   KENT-FRIEDMAN'S EEOC CHARGE

On March 3, 2017, Kent-Friedman filed a discrimination charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that NYSIF's failure to permanently appoint her as either DCI Director or DCI Assistant Director constituted sex discrimination. (See Pl. 56.1 Resp. ¶¶ 144-45; "EEOC Discrimination Charge," Dkt. No. 153-20.) In her EEOC filing, Kent-Friedman described herself as the Acting Assistant DCI Director. (See EEOC Discrimination Charge.)

Almost four months later, on June 29, Dormin emailed Kent-Friedman revisions to a DCI policy. (See Pl. 56.1 Resp. ¶ 148.) One of the revisions was elimination of the Assistant DCI Director position; Dormin said his reason for doing away

with the position was that he did not believe the position existed. (See id. ¶ 149.)

Kent-Friedman responded the same day and wrote, "I have noticed, particularly since the filing of my EEOC complaint, that you and others in the Legal Dept. have been taking on the handling of Legal duties which previously would have been given to me." (See Email, dated June 29, 2017, from Alison Kent-Friedman, Dkt. No. 154-2 [hereinafter "June 2017 Email"].) Dormin replied that he was not aware of any EEOC charge and did not curtail her duties. (See Pl. 56.1 Resp. ¶ 151.) Dormin testified that he did not see Kent-Friedman's EEOC charge until the discovery phase of this lawsuit. (See id. ¶ 156.)

On September 26, 2017, NYSIF submitted a Position Statement in response to Kent-Friedman's EEOC charge. (See EEOC Position Statement.) In it, NYSIF wrote that Dormin's "experience and leadership far outweigh that of Ms. Kent-Friedman and that is the sole reason he was hired." (See id. at 10.)

G.   KENT-FRIEDMAN'S INTEREST IN OTHER NYSIF POSITIONS

In 2017, NYSIF canvassed the Civil Service list to fill a position, titled Principal Attorney, in the competitive class. (See Pl. 56.1 Resp. ¶¶ 157–58.) Cusick, O'Brien, and

James Fiedler interviewed Kent-Friedman for the position, but they recommended another candidate, Kathleen Campbell ("Campbell"), for the job. (See id. ¶¶ 159-60.)

Campbell was appointed in January 2018 as Principal Attorney. (See id. ¶ 165.) In an email to O'Brien and Cusick, Kent-Friedman noted her "disappointment with the promotional process surrounding the Principal Attorney position that you interviewed me for." (See Email, dated Jan. 18, 2018, from Alison Kent-Friedman, Dkt. No. 164-17 [hereinafter "Jan. 2018 Email"].) She wrote, in part,

> I find it significant that you have chosen to promote over me, Kathleen Campbell, a woman, to Principal Attorney (a title previously held only by men) only after I filed a discrimination complaint with the EEOC. Notably, Ms. Campbell is the attorney defending against my EEOC complaint on behalf of the Fund.

(See id.)[7] Kent-Friedman's email signature contains the title "Acting Deputy Director/Supervising Attorney." (See Jan. 2018 Email.)

At the same time, Kent-Friedman was interested in pursuing a new Chief of Fraud Prevention position. (See id.) During Dormin's tenure, NYSIF created a fraud prevention unit in DCI, eliminating the functional Assistant DCI Director

---

[7] Defendants note that one of the responsibilities of the Principal Attorney position is to respond to labor relations and Equal Employment Opportunity complaints and that Cusick had begun transitioning these duties to Campbell before Kent-Friedman filed her EEOC charge. (See Pl. 56.1 Resp. ¶¶ 161-62.)

role and using the Civil Service item formerly associated with the Assistant DCI Director, i.e., the Chief of Investigations item, for the newly created Chief of Fraud Prevention role. (See Pl. 56.1 Resp. ¶¶ 173-74.)

Kent-Friedman, Oscelynn Davis ("Davis"), and others applied for the Chief of Fraud Prevention position. (See id. ¶ 178.) Dormin and O'Brien recommended that Davis be hired, and Davis started as Chief of Fraud Prevention on approximately July 5, 2018. (See id. ¶¶ 180-81.) Davis's official Civil Service title was Chief of Investigations. (See id. ¶ 182.)

H.   KENT-FRIEDMAN'S OFFICE IN MANHATTAN

Kent-Friedman testified that at the beginning of 2018, Dormin told her she would no longer have her own dedicated office in Manhattan. (See Pl. Dep. at 372:18-377:4.) At the time, the Manhattan office was undergoing renovations. (See id.) During the renovations, Kent-Friedman and others were provided temporary cubicles in which to work, and Dormin was provided a conference room to use as his temporary office. (See Pl. 56.1 Resp. ¶ 218.)

According to Dormin, he was told that following the renovations, there would be no office for Kent-Friedman. (See Deposition of John Dormin, dated Apr. 21, 2021, Dkt. No. 164-

4 [hereinafter "Dormin Dep."], at 226:9-14.) Dormin testified that he had no input into how many offices were being built. (See id. at 250:21-25.) Dormin allowed Kent-Friedman to use his office space when she came to work in the Manhattan office. (See Pl. 56.1 Resp. ¶ 222.)

Kent-Friedman testified that after she complained several times, Dormin allowed her to begin using a private guest office in the Manhattan location. (See Pl. Dep. at 378:24-379:20.) The guest office had a computer and a phone. (See id. at 381:11-14.) Every time she came to the Manhattan location, Kent-Friedman had to obtain the key to the guest office from a secretary in order to access it, according to her testimony. (See id. at 381:14-18.)

## II.  **PROCEDURAL HISTORY**

Kent-Friedman filed the original complaint in this matter on May 17, 2018. (See Dkt. No. 1.) She filed an amended complaint (the "Complaint") on September 27, 2018. (See Dkt. No. 41 [hereinafter "Compl."], at 32.) She alleges that due to her sex and in retaliation for complaining of discrimination, she has been repeatedly denied promotions to the positions of DCI Director and Assistant DCI Director. (See Compl. ¶ 3.) She also alleges that despite performing the additional duties of the positions, she received no

commensurate pay increase and was paid less than males for performing the work of the positions. (See id.)

Kent-Friedman brings her claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA"); the New York Equal Pay Act, N.Y. Lab. Law § 194 (the "NYEPA"); the New York Human Rights Law, N.Y. Exec. Law §§ 290–301 (the "NYHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. (the "NYCHRL").

In two letters dated October 11, 2018, Defendants wrote to Kent-Friedman and the Court to point out deficiencies in the Complaint, and Kent-Friedman responded on October 18, 2018. (See Dkt. Nos. 45-47.) At a telephone conference the same month, counsel for Kent-Friedman agreed to withdraw her state and local law claims against NYSIF, and the parties later did so by stipulation dated November 5, 2018. (See Dkt. No. 51.)

The Court then construed Defendants' letters as motions to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (See Dkt. No. 52 at 3.) The Court granted the motions to dismiss as to Count Four and denied the motions as to Counts One, Two, Three, Five, Six, Seven,

and Eight. (See id. at 8.) Defendants then answered the Complaint on December 14, 2018. (See Dkt. Nos. 55-56.)

The remaining claims are as follows. Count One is a Title VII discrimination claim against NYSIF. (See Compl. at 23.) Count Two is a Title VII retaliation claim against NYSIF. (See id. at 25.) Count Three is an EPA claim against NYSIF and all Individual Defendants except Dormin. (See id. at 26.) Count Five is a NYEPA claim against all Individual Defendants except Dormin. (See id. at 27.) Count Six is a NYHRL sex discrimination claim against the Individual Defendants. (See id. at 28.) Count Seven is a NYCHRL sex discrimination claim against the Individual Defendants. (See id. at 29.) And Count Eight is styled as a NYHRL and NYCHRL retaliation claim against the Individual Defendants. (See id.)

Defendants moved under Federal Rule of Civil Procedure 56 ("Rule 56") for summary judgment on December 5, 2022. (See Dkt. Nos. 152-61.) The motion asks the Court to dismiss the Complaint in its entirety. (See Dkt. No. 152.) Kent-Friedman filed answering papers March 3, 2023. (See Dkt. Nos. 164-66.) Defendants filed reply papers May 5, 2023. (See Dkt. Nos. 173-77.)

### III. <u>DISCUSSION</u>

Rule 56(a) provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, "[s]ummary judgment is proper if, viewing all the facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." <u>Samuels v. Mockry</u>, 77 F.3d 34, 35 (2d Cir. 1996) (per curiam). The role of the Court in ruling on the motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the nonmovant, no rational jury could find in favor of the nonmoving party. <u>See</u> <u>Gallo v. Prudential Residential Servs., L.P.</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party. <u>See</u> <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996). With this legal standard in mind, the Court turns to Defendants' arguments.

A.   <u>INDIVIDUAL LIABILITY UNDER STATE LAW</u>

Before evaluating the merits of Kent-Friedman's claims, the Court first addresses the Individual Defendants' threshold argument that they cannot be held liable under the NYEPA, NYHRL, or NYCHRL. (<u>See</u> Defs.' Mem. of Law Supp. Their Mot. for Summ. J., Dkt. No. 158 [hereinafter "Defs. Mem."], at 11–12, 17, 24–25.) Much of the issue comes down to whether the Individual Defendants can be defined as Kent-Friedman's "employers" under New York law. The Complaint alleges that each of the Individual Defendants is an "employer" under the EPA and NYEPA and that Madoff, O'Brien, and Cusick are "employer[s]" under "all claims pled." (<u>See</u> Compl. ¶¶ 23, 28, 33, 47.)

During the pendency of this lawsuit, the New York Court
of Appeals addressed the scope of individual liability under
NYEPA, NYHRL, and NYCHRL. See Doe v. Bloomberg L.P., 167
N.E.3d 454 (2021). In Doe, the court clarified a previous
case, Patrowich v. Chemical Bank, 473 N.E.2d 11 (N.Y. 1984)
(per curiam), holding that Patrowich stands for the
proposition that NYHRL "does not render employees liable as
individual employers." Doe, 167 N.E.3d at 459. The clear
implication is that the same is true of the NYEPA. See
Patrowich, 473 N.E.2d at 12 (mentioning NYEPA in first
sentence); Doe, 167 N.E.3d at 459 (stating that courts
misinterpreted first sentence of Patrowich and clarifying its
meaning).

The Doe court ultimately held that the NYCHRL should be
interpreted like the NYHRL: "[W]here a plaintiff's employer
is a business entity, the . . . employees of that entity are
not employers within the meaning of the City HRL. Rather,
those individuals may incur liability only for their own
discriminatory conduct, for aiding and abetting such conduct
by others, or for retaliation against protected conduct." 167
N.E.3d at 460. Additionally, the court observed that the
NYCHRL "specifically imposes primary liability on employees
for some discriminatory acts," such as discriminating based

23

on gender, "but conspicuously does not impose vicarious liability on these individuals." Id.

The Individual Defendants argue that the Court of Appeals's ruling forecloses some or all of Kent-Friedman's state-law claims. The Court thus takes each of them in turn, addressing whether they can survive summary judgment in the wake of Doe.

### 1.   New York Equal Pay Act

It is clear that Kent-Friedman's NYEPA claim against the Individual Defendants cannot withstand challenge under Doe. The Court of Appeals clarification of Patrowich in Doe also clarified the scope of a third case, Stoganovic v. DiNolfo, 461 N.Y.S.2d 121 (App. Div. 4th Dep't 1983), on which Patrowich relied. See Patrowich, 473 N.E.2d at 13. In Stoganovic, the court declined to hold that certain provisions of the New York Labor Law bestowed upon would-be plaintiffs a private right of action against officers and agents of corporations. See 461 N.Y.S.2d at 122–23, aff'd, 462 N.E.2d 149 (N.Y. 1984). Federal courts have interpreted the rule of Stoganovic to be "limited only to claims for unpaid wages against officers or shareholders *who do not qualify as employers*" under Article 6 of the Labor Law, which includes the NYEPA. Lauria v. Heffernan, 607 F. Supp. 2d 403,

409 (E.D.N.Y. 2009) (emphasis added) (quotation marks omitted); see <u>Chu Chung v. New Silver Palace Rests., Inc.</u>, 272 F. Supp. 2d 314, 318 (S.D.N.Y. 2003) (stating that <u>Stoganovic</u> "does not affect the issue of whether employers may be sued" for violating Article 6). But such an interpretation cannot survive the <u>Doe</u> court's holding that "a corporate employee simply does not qualify as an 'employer,' regardless of the employee's position or relationship to the employer," under the Labor Law. See <u>Doe</u>, 167 N.E.3d at 459.

Kent-Friedman's theory of recovery under the NYEPA depends on a showing that Madoff, O'Brien, Mullen, and Cusick qualify as "employers" under state law. (See Compl. ¶ 47.) The Court finds that this theory has been foreclosed by the holding in <u>Doe</u>. See 167 N.E.3d at 459. The NYEPA claim thus cannot stand, and the Individual Defendants' motion for summary judgment is accordingly **GRANTED** with respect to Count Five.

    2.   <u>New York Human Rights Law</u>

After <u>Doe</u>, courts have recognized that defendants similarly situated to the Individual Defendants here cannot be held liable as employers under the NYHRL but may still be liable under an aider-and-abettor theory. See <u>Baptiste v. CUNY</u>, --- F. Supp. 3d ----, No. 22 Civ. 2785, 2023 WL 4266914,

at *6 (S.D.N.Y. June 29, 2023); Bueno v. Eurostars Hotel Co.,
No. 21 Civ. 535, 2022 WL 95026, at *7 (S.D.N.Y. Jan. 10,
2022). Kent-Friedman argues that her NYHRL claims are not
barred by Doe because she pleaded the aider-and-abettor
theory. (See Compl. ¶ 156.)

The Court agrees. The Individual Defendants argue that
Kent-Friedman cannot establish aiding-and-abetting liability
as a matter of law because there is no NYHRL claim against
the principal, NYSIF, which is entitled to sovereign immunity
under NYHRL. (See Defs.' Reply Mem. of Law in Further Supp.
of Their Mot. for Summ. J., Dkt. No. 173 [hereinafter "Reply
Mem."] at 16-17.) But a district court in this Circuit
analyzed this issue in detail in Bonaffini v. CUNY, No. 20
Civ. 5118, 2021 WL 2895688 (E.D.N.Y. July 9, 2021), and
concluded that "state employees are often liable in their
individual capacities even though their employer would enjoy
sovereign immunity." 2021 WL 28956688, at *3; see also id.
("I thus conclude that the NYSHRL and NYCHRL do not bar
plaintiff from suing . . . for aiding and abetting the alleged
violations.").

Because the Individual Defendants provide no reason for
the Court to depart from Bonaffini, the Court concludes that
Doe does not bar Kent-Friedman's NYRHL claims and will return

to them when the Court evaluates the discrimination and
retaliation claims on the merits.

    3.   <u>New York City Human Rights Law</u>

    The Court also finds that Kent-Friedman's NYCHRL claims
are not foreclosed by <u>Doe</u>. The <u>Doe</u> court recognized that the
NYCHRL is broader than the NYHRL in that it explicitly forbids
an employee (in addition to an employer) from personally
engaging in employment discrimination based on gender or
other status categories. <u>Compare</u> N.Y.C. Admin. Code § 8-
107(1)(a), <u>with</u> N.Y. Exec. Law § 296(1)(a). <u>Doe</u> held only
that, where there is no allegation that a corporate official
personally engaged in discriminatory acts, the official
cannot be held liable under the NYCHRL on the basis that he
or she qualifies as the plaintiff's "employer" under certain
tests the lower courts had been using. <u>See Doe</u>, 167 N.E.3d at
457-63. Although here the Complaint states that Madoff,
O'Brien, and Cusick are "employer[s]" under "all claims pled"
(<u>see</u> Compl. at 23, 28, 33), Kent-Friedman has also alleged
that the Individual Defendants at all relevant times were
"employed by" NYSIF. (<u>See</u> Compl. at 22, 26, 31, 36, 40.) They
are thus subject to the NYCHRL, and the Court will accordingly
return to Kent-Friedman's claims under that law upon reaching
the merits.

B.   <u>THE EQUAL PAY ACT CLAIM</u>

In Count Three, Kent-Friedman accuses NYSIF, Madoff, O'Brien, Mullen, and Cusick of discriminating against her in violation of the EPA by paying her less money than similarly situated male colleagues because of her sex. (<u>See</u> Compl. ¶ 169.) The EPA provides,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any . . . factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). To prove a prima facie EPA violation, Kent-Friedman must demonstrate that (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions. See <u>EEOC v. Port Authority</u>, 768 F.3d 247, 254-55 (2d Cir. 2014).

"[A] plaintiff need not prove that the defendant intentionally discriminated against her; it is sufficient that some pay differential exists." Butler v. N.Y. Health & Racquet Club, 768 F. Supp. 2d 516, 529 (S.D.N.Y. 2011). Moreover, a plaintiff does not have to show that her job is identical to the more remunerative position; she need only demonstrate that the two jobs are "substantially equal." Sobol v. Kidder, Peabody & Co., 49 F. Supp. 2d 208, 219 (S.D.N.Y. 1999) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995)). The question of whether two positions are substantially equal is ordinarily for the jury. See Lavin-McEleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001).

Once a prima facie case has been established, "the burden shifts to the defendant to prove that the wage difference is justified by one of [the] four affirmative defenses" from the text of the statute. Doria v. Cramer Rosenthal McGlynn, Inc., 942 F. Supp. 937, 941 (S.D.N.Y. 1996). The defenses are "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; [and] (iv) a differential based on any . . . factor other than sex." 29 U.S.C. § 206(d)(1); see Doria, 942 F. Supp. at 941–42. "If a defendant relies on the fourth affirmative defense (factor other than sex), he or she must also prove that this factor

has a legitimate business purpose." <u>Doria</u>, 942 F. Supp. at 942.

If the employer establishes one of the affirmative defenses, "the plaintiff may counter [it] by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." <u>Ryduchowski v. Port Authority</u>, 203 F.3d 135, 142 (2d Cir. 2000) (quoting <u>Belfi v. Prendergast</u>, 191 F.3d 129, 136 (2d Cir. 1999)).

The statute of limitations applicable to an EPA claim is two years, "except that a cause of action arising out of a willful violation may be commenced within three years." 29 U.S.C. § 255(a); <u>see Santiago v. ACACIA Network, Inc.</u>, 634 F. Supp. 3d 143, 154 (S.D.N.Y. 2022). Kent-Friedman alleges a willful violation. (<u>See</u> Compl. ¶ 173.)

### 1.   Prima Facie Case

The parties dispute whether Kent-Friedman can make out a prima facie case under the EPA. (<u>See</u> Defs. Mem. at 9; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., Dkt. No. 166 [hereinafter "Pl. Mem."], at 3-6.) Specifically, Defendants[8] argue that Kent-Friedman cannot establish the

---

[8] In the context of the EPA claim, references to "Defendants" do not apply to Dormin, against whom Kent-Friedman does not assert her EPA claim. (<u>See</u> Compl. at 26.) Madoff, O'Brien, Mullen, and Cusick do not argue that they should not be subject to individual liability under the EPA, but even if they did, such an argument would be unavailing at this stage. <u>See</u> <u>Doe</u>, 167 N.E.3d at 459 (contrasting state laws with the EPA, which "broadly define[s] an employer"); <u>MacIntyre v. Moore</u>, 335 F. Supp. 3d 402, 418-24

second element (i.e., the element that, with respect to a male comparator, here DiSenso, she performed equal work on a job requiring equal skill, effort, and responsibility) or the third element (i.e., the element that the job, here the Assistant DCI Director position,[9] was performed under similar working conditions with respect to the male comparator) of her prima facie burden. (See Defs Mem. at 9.)

Defendants concede the first element, as nowhere do they argue that Kent-Friedman, as Acting Assistant DCI Director, did not make less money than DiSenso made when he was permanently appointed to that position. See, e.g., Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd., 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived."). In any case, the record shows that Kent-Friedman made $121,997 in 2015 as Acting Assistant DCI Director, while DiSenso made $127,794 in 2010 as the permanent appointee. (See Defs. 56.1 Resp. ¶ 259; Answer to Amended Complaint, Dkt. No. 56 [hereinafter "Answer"], ¶ 82.)

---

(W.D.N.Y. 2018) (holding that public officials can be held individually liable under the Fair Labor Standards Act, which includes the EPA).

[9] Kent-Friedman served as Acting DCI Director until approximately February 2014 (see Pl. 56.1 Resp. ¶ 70), and this action was originally filed in May 2018 (see Dkt. No. 1), so any claim predicated on her service as Acting DCI Director is outside the statute of limitations, which at most is three years, as Kent-Friedman acknowledges (see Pl. Mem. at 4). See 29 U.S.C. § 255(a).

With respect to the second EPA prima facie case element, Defendants argue that Kent-Friedman cannot establish that she "was performing 'equal work' requiring 'equal effort and responsibility'" because she could not, while continuing to perform duties associated with her preexisting Supervising Attorney position (see Pl. Dep. at 294:21–295:13), have taken on the workload of a permanently appointed Assistant Director without a concomitant increase in the number of hours she worked. (Defs. Mem. at 9.) Defendants base this argument on purported testimony showing that Kent-Friedman's schedule did not change despite her supposedly increased workload. (See id.)

Defendants misrepresent Kent-Friedman's testimony. Her statement that her schedules were "basically similar" was in response to a question asking her to compare her jobs as Acting Assistant Director and Acting Director, not Acting Assistant Director and Supervising Attorney. (See Pl. Dep. at 271:2–11.)

Defendants also base their argument with respect to the second element on testimony concerning the Acting Director position in 2012 and 2013. (See Defs. Mem. at 9; Pl. Mem. at 4; Pl. Dep. at 226:10–232:25.) But, as Kent-Friedman has acknowledged, claims arising from this period are barred by the statute of limitations. (See Pl. Mem. at 4; Compl. ¶ 173.)

32

The testimony concerning 2012 and 2013 has nothing to do with events that took place within the limitations period and upon which Kent-Friedman bases her EPA claim. See 29 U.S.C. § 255(a) (stating that statute of limitations is two or three years, depending on whether violation was willful). Defendants' argument on the second element thus fails; Defendants have not refuted Kent-Friedman's testimony that, as Acting Assistant Director, she performed all the duties that DiSenso performed while he was the permanently appointed Assistant Director. (See Pl. Dep. at 295:21–297:12.)

Defendants' argument with respect to the third EPA element is also unavailing. Defendants contend that, compared to permanently appointed Assistant Directors, Kent-Friedman as Acting Assistant Director did not work under "similar . . . conditions" because she remained a competitive class employee and thus "enjoyed the vast protections afforded by the Civil Service Law." (Defs. Mem. at 9.) The last person to be permanently appointed as Assistant Director was in the exempt class and was therefore essentially an at-will employee. (See Pl. 56.1 Resp. ¶¶ 12, 61.) But in Corning Glass Works v. Brennan, the Supreme Court interpreted the phrase "working conditions" in the EPA to refer to physical hazards and surroundings such as "toxic chemicals or fumes." 417 U.S. 188, 202 (1974); see, e.g., Cullen v. Ind. Univ. Bd. of Trs.,

33

338 F.3d 693, 700 n.3 (7th Cir. 2003) ("'[W]orking conditions' refers to physical surroundings and hazards encountered on the job."); see also 29 C.F.R. § 1620.18(a) ("'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause."). Defendants do not cite any legal authority supporting their argument that, contrary to the reasoning in Corning Glass Works, the presence or lack of Civil Service tenure protection qualifies as a "working condition" under the EPA. Defendants' argument with respect to the third element thus fails, and they accordingly have not carried their burden to show that Kent-Friedman cannot make a prima facie EPA case.

   2.   Affirmative Defense

   Defendants next argue that even if Kent-Friedman can establish a prima facie case, her EPA claim must be dismissed because Defendants have established the affirmative defense that any disparity in compensation between Kent-Friedman and DiSenso was based on a "[f]actor[] [o]ther than [s]ex." (Defs. Mem. at 10.)[10] Defendants contend that the pay differential

---

[10] Kent-Friedman argues that Defendants waived this affirmative defense because it was not pleaded with sufficient specificity. (See Pl. Mem. at 6-7.) The ninth and tenth defenses listed in Defendants' Answer state that any alleged wage disparity or pay differential between Kent-Friedman and "male comparators" was "based on a factor other than sex." (See Answer ¶¶ 209-10.) Even if the Answer should have been more specific with respect to these defenses, a defendant may raise an affirmative defense for the first time in a motion for summary judgment as long as the plaintiff has an opportunity to respond. See Dina v. Cuda & Assocs., 950 F. Supp. 2d

between Kent-Friedman and DiSenso was justified because "neither NYSIF nor any of the other defendants had any discretion or authority to increase Plaintiff's salary" given that Kent-Friedman "officially remained in her role as Supervising Attorney, a civil service competitive class position." (Defs. Mem. at 10.) The parties argue at length about whether, as a matter of New York law, NYSIF truly did not have discretion to unilaterally increase Kent-Friedman's salary for serving as Acting Assistant DCI Director while she remained in a competitive class position. (See Pl. Mem. at 9–10; Reply Mem. at 3–7.)

These arguments miss the point. Even if NYSIF did not have discretion under *state* law to increase Kent-Friedman's salary for acting as Assistant DCI Director while she remained in a competitive class job, *federal* law forbids NYSIF from paying women employees less than men on the basis of mere job titles. See Moccio v. Cornell University, 889 F. Supp. 2d 539, 569–70 (S.D.N.Y. 2012) ("[T]he standard under the Equal Pay Act is job content and not job title or description." (quoting Tomka, 66 F.3d at 1310)); EEOC v. Port Authority, No. 10 Civ. 7462, 2012 WL 1758128, at *3 (S.D.N.Y. May 17,

---

396, 407 n.13 (D. Conn. 2013); Astor Holdings, Inc. v. Roski, 325 F. Supp. 2d 251, 260–61 (S.D.N.Y. 2003). As Kent-Friedman has responded to the defense, see Pl. Mem. at 7–11, the Court considers the affirmative defense on its merits.

2012) ("Job *content*, not job titles or classifications, determines the equality of jobs." (quoting EEOC Compliance Manual § 10-IV(E)(2) (2000))), <u>aff'd</u>, 768 F.3d 247 (2d Cir. 2014); <u>see also</u> 29 C.F.R. § 1620.13(e) ("Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance.").

As explained above, there is a factual dispute between the parties about whether NYSIF had the discretion to unilaterally (i.e., without final approval from the Center for Recruitment) appoint Kent-Friedman as permanent Assistant DCI Director and equalize her pay accordingly. (<u>See</u> Mullen 30(b)(6) Dep. at 146:21–147:2.)[11] And even if NYSIF lacked that discretion, Defendants do not argue that they did not have the discretion to at least *nominate* Kent-Friedman for permanent appointment and an increased salary subject to final approval from the Center for Recruitment.

Kent-Friedman cites <u>Cooke v. United States</u>, 85 Fed. Cl. 325 (2008), which the Court agrees is analogous to the instant

---

[11] In their reply, Defendants argue for the first time that exempt class positions cannot be filled without also getting the approval of the Director of the Budget. (<u>See</u> Reply Mem. at 11.) To support this proposition, they cite the State Personnel Management Manual. (<u>See</u> <u>id.</u>) But this contention contradicts Defendants' Statement of Material Facts, which explains that since NYSIF is funded entirely by policyholder premiums and investment income, the agency does not need approval from the state Division of the Budget to appoint people to exempt class positions. (<u>See</u> Pl. 56.1 Resp. ¶¶ 2, 19.)

case. There, plaintiff Marjorie Murtagh Cooke ("Cooke") sued the United States government, alleging that the National Transportation Safety Board ("NTSB") violated the EPA by paying her less than similarly situated males. See 85 Fed. Cl. at 329. In 1997, the NTSB restructured its Office of Surface Transportation Safety by dividing it into four "surface modal offices," and Cooke became Director of one of these offices; the other three Directors were men. See id. at 330. All four Directors were paid at the same "General Schedule" level. See id. In 2000, the NTSB merged two of the four offices (neither of which was the office led by Cooke) so that there were three offices left, and a male became Acting Director of the newly merged office. See id. The NTSB intended to pay each Director at the higher "Senior Executive Service" ("SES") level, but no SES slots were available, and NTSB could not create new SES slots without authorization from the Office of Personnel Management. See id. In 2001 and 2003, respectively, two SES slots became available, and NTSB awarded them to the two men in the surface modal offices not led by Cooke. See id. at 331. Cooke was transferred to another office in 2005 and retired in 2006. See id. at 333. She sued in 2006, alleging that she was paid less for equal work than the other two Directors of surface modal offices between 2003 and 2005. See id. at 340, 342.

After a trial, the Court of Federal Claims found an EPA violation. See id. at 354. It rejected the government's argument that it was entitled to an affirmative defense because of the "numerous statutes and regulations governing the Federal employee pay system" and the fact that it "could not have promoted Ms. Murtagh Cooke to an SES slot because no SES slots were available." Id. at 348. Like the parties here, the litigants in Cooke sparred over the extent of the NTSB's discretion to increase the plaintiff's pay. See id. The court answered, "The Government's excuses . . . do not justify the NTSB's failure to make any effort to resolve Ms. Murtagh Cooke's pay differential." Id. Like the NTSB in Cooke, the Defendants here cannot rely on government regulations to obtain judgment as a matter of law under the EPA when it is clear that they had at least *some* discretion — exactly how much is a genuine issue of material fact — to "make an[] effort to resolve [Kent-Friedman's] pay differential" by nominating her to the Center for Recruitment for an increased salary. Id.

That Kent-Friedman's job title signaled that she was only temporarily, rather than permanently, serving as Assistant DCI Director does not necessarily change the analysis. EEOC regulations state that where an employee is "required, during [a] period of temporary reassignment, to

perform work for which employees of the opposite sex are paid a higher wage rate than that paid for the duties of the employee's regular job classification," the employer "may continue to pay the reassigned employee at the lower rate, *if . . . the reassignment is in fact a temporary one*." 29 C.F.R. § 1620.26(b) (emphasis added). "Generally, failure to pay the higher rate to an employee reassigned for a period longer than one month will raise questions as to whether the reassignment was in fact intended to be temporary." Id.

Flynn v. Goldman, Sachs & Co. is instructive on the underlying point. See No. 91 Civ. 35, 1993 WL 336957 (S.D.N.Y. Sept. 2, 1993). In Flynn, the plaintiff worked as Acting Manager and alleged that she was underpaid compared to a man who had previously worked as Manager. Id., at *7. On summary judgment, the court rejected the defendant's argument that the plaintiff's temporary status absolved the defendant of liability, concluding that the plaintiff's term of eight months in the Acting Manager position "creat[ed] a factual issue . . . whether the exception for temporary assignments applies." Id.

Similarly, in Cavazos v. Housing Authority of Bexar County, the defendant housing authority argued that it had established an affirmative defense under the EPA because the "temporary    nature"    of    the    plaintiff's    service    for

approximately nine months as Interim Executive Director was a "factor other than sex" that justified the higher salaries of two men who had previously served as Executive Director. No. 5:17 Civ. 432, 2019 WL 1048855, at *7 (W.D. Tex. Mar. 5, 2019). Like NYSIF, the defendant was a public agency. See id., at *3 (citing to U.S. Department of Housing and Urban Development memorandum that notes the housing authority was established by the Commissioners Court of Bexar County).[12] The plaintiff, Rachel Cavazos ("Cavazos"), served as Interim Executive Director while a committee searched for a replacement for the Executive Director in the wake of the latter's resignation. See id. There is nothing in the opinion suggesting that the housing authority did not have complete discretion as to who to hire for the Executive Director position. The housing authority's Board of Commissioners (the "Board") extended Cavazos's term as Interim Executive Director more than once while it negotiated, ultimately unsuccessfully, with its search committee's top candidate. See id.

The Magistrate Judge pointed out that there was evidence in the record that Cavazos had reason to believe she would be

---

[12]   The memorandum is available at https://www.hudoig.gov/reports-publications/memorandums/housing-authority-bexar-county-tx-did-not-operate-its-hud-public and was part of the record in the Cavazos case. See Cavazos, No. 5:17 Civ. 432 (W.D. Tex. July 16, 2018), ECF No. 23-1, at 3.

promoted permanently to Executive Director: She was apparently told before she accepted the interim position that she "was the committee's second-choice candidate and that if [the first choice] declined the position, she would 'be automatically or semi-automatically promoted to [Executive Director].'" Id., at *7 (citation omitted). After negotiations with the first choice fell through, Cavazos was asked to submit a proposed employment contract. See id. at 3. But her own negotiations with the Board also fizzled, even though she requested an annual salary of $120,000 — $30,000 less per year than the previous Executive Director's salary. See id. The Board never voted on an agreement to hire her, and she eventually resigned. See id. The Magistrate Judge recommended denial of the defendant's summary judgment motion, concluding that "reasonable minds could disagree as to whether Plaintiff's duration of employment as interim executive director . . . could accurately be characterized as interim or temporary." Id., at *8.[13]

In a third case, Nelson v. Chattahoochee Valley Hospital Society, the plaintiff female employee claimed the defendant violated the EPA by paying her less money while she was

---

[13] The District Court accepted the Magistrate Judge's recommendation after conducting a de novo review and denied the summary judgment motion. See Cavazos, No. 5:17 Civ. 432 (W.D. Tex. Mar. 22, 2019), ECF No. 35.

Interim Nurse Manager than it had paid to a male who was previously Nurse Manager. See 731 F. Supp. 2d 1217, 1236 (M.D. Ala. 2010). The defendant relied on the "factor other than sex" affirmative defense, arguing that the EPA "does not require employers to equalize the pay of permanent and temporary employees, even if both types of employees are tasked with substantially equal work." Id. The court, noting that the record did "not show that [the plaintiff] knew that her position was temporary" and that her "tenure as Interim Nurse Manager lasted for more than one month," denied the defendant's motion for summary judgment and wrote, "The EPA requires courts to compare the substance, not the form, of employees' jobs." Id.

Kent-Friedman is similarly situated to the plaintiffs in Flynn, Cavazos, and Nelson. There is evidence suggesting that she served in the Acting Assistant Director role for at least two years,[14] far longer than the eight months in Flynn and the nine months in Cavazos. There is also evidence indicating that Kent-Friedman had an expectation that her service as Acting Assistant Director would lead to a permanent

---

[14] Kent-Friedman agreed to become Acting Assistant DCI Director in February 2014. (See Defs. 56.1 Resp. ¶ 270.) Dormin, who is not a party to the EPA claim, denies that Kent-Friedman served as Acting Assistant Director at any time after he was hired in September 2016. (See id. ¶ 258.) But Dormin signed DCI organizational charts for the first, second, third, and fourth quarters of 2017 and the first quarter of 2018 that listed Kent-Friedman as Acting Assistant Director. (See id. ¶ 293.)

appointment to the job. (See Pl. Dep. at 63:25–64:7, 249:14–250:15; May 2014 Email.)[15] This evidence is sufficient to create an issue of material fact as to whether Kent-Friedman's service in the Acting Assistant Director role was, for EPA purposes, truly temporary.

Yu v. New York State Unified Court System Office of Court Administration, upon which Defendants rely, is not to the contrary. See No. 11 Civ. 3226, 2013 WL 3490780 (S.D.N.Y. July 12, 2013). In Yu, the court dismissed an EPA claim after observing that "any disparity in compensation between Yu and her colleagues" was partially the result of their respective Civil Service rankings. 2013 WL 3490780, at *4. But Defendants fail to acknowledge that the alleged compensation disparity in Yu was also attributable to differences in the employees' "responsibilities, and overall workload." Id. Relatedly, the Yu court ruled that the plaintiff could not establish a prima facie case because there was no evidence that the defendant "paid different wages to males and females performing work of equal skill, effort, and responsibility under similar working conditions." Id. That is not the situation here. As explained

---

[15] As in Cavazos, the fact that NYSIF has discretion regarding who to hire for exempt positions would not necessarily render such an expectation unreasonable.

above, Defendants have not shown that Kent-Friedman is unable to make a prima facie case.

Defendants also cite Kassman v. KPMG LLP, 925 F. Supp. 2d 453 (S.D.N.Y. 2013), but that case is no more helpful to them than Yu. Defendants characterize Kent-Friedman's EPA claim as seeking to remedy "promotion discrimination" and argue that Kassman stands for the proposition that such a failure-to-promote claim is not protected by the EPA. Defs. Mem. at 10–11. The relevant part of Kassman reads, "Although the EPA does not afford a remedy for denial of promotions, or 'titles,' the fact that comparators of the opposite sex had different job titles does not bar an EPA claim." 925 F. Supp. 2d at 471. This statement helps Kent-Friedman, not Defendants.

It would be one thing if Kent-Friedman did not do any of the work associated with the Assistant Director position and merely wished to be promoted to Assistant Director. In such a case, perhaps Defendants would be correct that, even if Kent-Friedman could bring another type of claim due to a discriminatory or retaliatory promotion process, she would have no EPA claim. (See Defs' Mem. at 11 n.6.)

But this case is different. What Kent-Friedman alleges here is that she did the work associated with the Assistant Director position but was paid less than a male, DiSenso, who

44

previously held that job. (See, e.g., Pl. Dep. at 295:21-
297:12.) Defendants' reliance on Kassman is thus misplaced.
See Kassman, 925 F. Supp. 2d at 471 (stating that the EPA is
not dependent on job classifications or titles but rather "is
concerned with the provision of equal pay for equal work").

Defendants' final EPA argument is that NYSIF's "good-
faith application of applicable policies and procedures
warrants dismissal of Plaintiff's EPA claims." (Reply Mem. at
7.) Defendants contend that NYSIF applies the Civil Service
Law on a "gender neutral" basis and that "multiple employees
— male and female — [have] served in various roles in an
acting capacity without any increase in salary or change in
civil service title." (Id.)

Mullen, who as NYSIF Director of Administration oversaw
personnel functions, declared under penalty of perjury that
typically, NYSIF employees who fill vacancies in an "acting"
capacity "formally remain[] in their official approved civil
service position until such time as a permanent appointment
is made or the operational need ceases to exist." (See
Declaration of Joseph Mullen, Dkt. No. 156, ¶ 13.) In the
usual case, according to Mullen, the acting employee "still
performs permanent duties of the official position the
employee occupies, together with essential functions of the
acting role to support NYSIF during a period of vacancy."

45

(See id. ¶ 14.)[16] For example, while Kent-Friedman served as
Acting DCI Director, Obiajulu and Rob Tronovitch
("Tronovitch") functioned as Acting Supervising Attorney and
Acting Supervising Field Investigator, respectively, but they
were not paid extra money for serving in those roles. (See
Pl. 56.1 Resp. ¶¶ 87–89.) Other NYSIF employees, including
(after this lawsuit was filed) Cusick, have occupied
positions on an acting basis without additional pay. (See id.
¶¶ 33, 83–86, 89.)

Defendants' argument, in which they contend that "there
is absolutely no evidence of any discriminatory
interpretation or application of the Civil Service Law," both
seeks to shift away their burden to prove their affirmative
defense and amounts to a claim that two prima facie EPA
violations cancel each other out if they are inadvertent and
are committed respectively against a woman and a man. But
Kent-Friedman need not prove that Defendants intentionally

---

[16] Kent-Friedman urges the Court to disregard Mullen's declaration on the
ground that Mullen was deposed in this matter. (See Pl. 56.1 Resp. ¶ 91.)
She relies on Simmons v. City of New York for the proposition that
"[a]ffidavits of witnesses who were deposed are disfavored on summary
judgment." No. 16 Civ. 1589, 2017 WL 6397745, at *12 n.13 (S.D.N.Y. Dec.
13, 2017). But this rule "is not absolute," especially where the
subsequent testimony amplifies or explains, rather than contradicts, the
prior testimony. Bright v. Coca-Cola Refreshments USA, Inc., 639 F. App'x
6, 8 (2d Cir. 2015); see Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.
1996) ("[A] material issue of fact may be revealed by [a party's]
subsequent sworn testimony that amplifies or explains, but does not merely
contradict, his prior testimony . . . ."). Since Kent-Friedman does not
argue that Mullen's declaration contradicts his previous statements, the
Court is not persuaded that the declaration should be disregarded.

applied or interpreted the Civil Service Law in a discriminatory manner. See Butler, 768 F. Supp. 2d at 529. Nor need she show that NYSIF's Civil Service policies systematically favor males over females. See EEOC v. Md. Ins. Admin., 879 F.3d 114, 122 (4th Cir. 2018) ("An EPA plaintiff is not required to demonstrate that males, as a class, are paid higher wages than females, as a class, but only that there is discrimination in pay against an employee with respect to one employee of the opposite sex.").

In any case, even if the Court were to accept their "good-faith," "gender neutral" rule, Defendants could not on this record establish as a matter of law that NYSIF uniformly applied a clearly articulated policy to Kent-Friedman, Obiajulu, Tronovitch, and the rest of its employees alike. For instance, after Tronovitch began serving as Acting Supervising Field Investigator, he was apparently, unlike Kent-Friedman, appointed permanently to the new position. (See First Quarter 2015 DCI Organizational Chart, Dkt. No. 164-31; SeeThroughNY.net Search Results for Robert C. Tronovitch, 2012–17, Dkt. No. 164-32.) As for Obiajulu, it is unclear from the record how long he served in his temporary position, and Cusick testified that upon Obiajulu's request, NYSIF moved Obiajulu back to his prior Civil Service position. (See Cusick Dep. at 173:7–174:5.) Accordingly, a genuine

47

issue of material fact arises here as to which reasonable jurors could disagree: whether NYSIF treated Kent-Friedman as it treated all its other workers similarly situated.

It is true that cases such as Girdis v. EEOC, 688 F. Supp. 40 (D. Mass. 1987) contain language suggesting that the uniform application of gender-neutral personnel policies constitutes an acceptable factor other than sex for the purposes of the EPA affirmative defense. See 688 F. Supp. at 45-46 (holding after bench trial that uniformly applied policies produced different outcomes for preexisting federal employees compared to new federal employees, regardless of sex); Lissak v. United States, 49 Fed. Cl. 281, 285-86 (2001) (holding that collectively bargained system under which different rules were applied to different employees based on date of hire was acceptable under the EPA). Defendants argue that the logic of these cases saves their affirmative defense.

The Court, however, reads Girdis and Lissak to say that the uniform application of a facially neutral personnel policy can serve as evidence that a pay differential is the result of some *other* non-sex factor. In Girdis, the factor truly differentiating the male employee from his female colleagues was previous employment status; the defendant's uniform application of its policies was merely the mechanism producing that result. See 688 F. Supp. at 46. Similarly, the

true differentiating factor in <u>Lissak</u> was each employee's date of hire. <u>See</u> 49 Fed. Cl. at 286 ("Defendant's system of differing pay and classification rules, which resulted from a series of collective bargaining agreements, is a bona-fide, gender-neutral, acceptable personnel policy that . . . *applies different rules to different employees based on date of hire*." (emphasis added)).

Indeed, if the uniform application of a facially neutral policy could be an end in itself for EPA purposes, a policy whose inadvertent result is less pay for women would be immune from the EPA for no other reason than that the policy was followed, even if no factor other than sex could explain its discriminatory effect. The Court declines to read <u>Girdis</u> and <u>Lissak</u> to stand for such a proposition. <u>See</u> <u>Girdis</u>, 688 F. Supp. at 46 ("The Equal Pay Act does not authorize a court to substitute its judgment for the judgment of an employer with regard to a bona fide personnel program, *so long as it does not discriminate on the basis of sex*." (emphasis added)). As Defendants have not explained how their supposedly gender-neutral application of the Civil Service Law serves to isolate any other non-sex factor differentiating Kent-Friedman from male colleagues such as Tronovitch, the Court is not persuaded that it should dismiss Kent-Friedman's EPA claim under the

reasoning of <u>Girdis</u> or <u>Lissak</u>, which, in any case, are not binding on this Court.

In reaching this conclusion, the Court is mindful of the difficulties often endured by government administrators tasked with filling job vacancies in the face of budget constraints and Civil Service regulations. The Court's holding should not be interpreted as a rule forbidding under all circumstances the appointment of a relatively lower-paid employee on a temporary or interim basis to fill a role previously occupied by a higher-paid worker of the opposite sex. Even under these circumstances, where there is evidence that Kent-Friedman served as Acting Assistant Director not for months but for years, a jury could still find that her appointment was in fact a bona fide temporary appointment and thus that Defendants are entitled to their affirmative defense. The Court merely decides that on this record, there is a genuine issue of material fact as to that question under the EPA.

In sum, Defendants have not established that they are entitled to judgment as a matter of law on Kent-Friedman's EPA claim.[17] Defendants' motion is accordingly **DENIED** with respect to Count Three.

---

[17] To the extent that Defendants rely on the separate affirmative defense that the alleged pay differential between Kent-Friedman and DiSenso was justified by a seniority system (<u>see</u> Defs. Mem. at 11), such defense is

C.   THE RETALIATION CLAIMS

Count Two of the Complaint accuses NYSIF of retaliating against Kent-Friedman in violation of Title VII for "her complaints against and resistance to discriminatory and unfair employment practices." (Compl. ¶ 165.) Count Eight is styled as both a NYCHRL and NYSHRL retaliation complaint against the Individual Defendants. (Compl. at 29-30.) Kent-Friedman argues that she was retaliated against in two ways: her dedicated office in Manhattan was taken away, and Campbell was chosen over her for promotion to the Principal Attorney position. (See Pl. Mem. at 24-25.)

1.   Title VII

To establish a prima facie case of Title VII retaliation, a plaintiff must demonstrate by a preponderance of the evidence "(1) participation in a protected activity; (2) [that] the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Mazyck v. Metro. Transp. Auth., 893 F. Supp. 2d 574,

without merit. To establish the seniority defense, Defendants "must be able to identify standards for measuring seniority which are systematically applied and observed." Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995). Defendants have not identified such standards, and they do not argue anywhere that Kent-Friedman was not permanently appointed as Assistant DCI Director (and paid accordingly) because she lacked the requisite seniority.

591 (S.D.N.Y. 2012). Defendants concede that Kent-Friedman's filing of an EEOC charge was a protected activity and thus that she can establish the first element. (See Defs. Mem. at 18.)

With respect to the fourth element, causation can be proven "'directly, through evidence of retaliatory animus directed against the plaintiff by the defendant,' or 'indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence.'" Dodd v. CUNY, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020). Generally, to indirectly establish causation via temporal proximity in the Second Circuit, a plaintiff must show that no more than two or three months passed between the protected activity and the adverse employment action. See id.; Berrie v. Board of Education, 750 F. App'x 41, 49 (2d Cir. 2018) ("Temporal proximity alone is generally insufficient after about three months."). Title VII imposes a "but-for" standard of causation, meaning the desire to retaliate must be shown to have been the "but-for cause of the challenged employment action." Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018).

Kent-Friedman cannot establish the fourth element of her prima facie case on this record. As an initial matter, she cites no direct evidence of retaliatory animus; she must

therefore resort to indirect evidence. And other than noting the "temporal gap" (Pl. Mem. at 25), Kent-Friedman makes only conclusory statements regarding retaliatory intent. For instance, she argues that she "was vastly more qualified than Campbell" and states that "no notes were taken during the interviews" for the Principal Attorney position, but she does not cite to any evidence supporting those claims. (See id.; Pl. 56.1 Resp. ¶¶ 160-63.)

As for temporal proximity, Kent-Friedman cannot overcome the general rule in the Second Circuit that gaps longer than two or three months cannot establish a prima facie case. She filed her EEOC charge on March 3, 2017 (see EEOC Discrimination Charge), and Dormin asserted that he became aware of the claim in June 2017 (see June 2017 Email). But Kent-Friedman did not lose her Manhattan office until early 2018. (See Pl. Dep. at 372:18-377:4.) Likewise, Campbell was not appointed as Principal Attorney until January 2018. (See Pl. 56.1 Resp. ¶ 165.) Even if Kent-Friedman can use the date that Dormin (as opposed to NYSIF) became aware of the EEOC charge, there is still, at minimum, a six-month gap between Dormin's awareness of the charge and the allegedly retaliatory actions. That gap is, relatively speaking, far longer than is tolerated by the general rule stated in Dodd and Berrie.

Moreover, Kent-Friedman, other than baldly accusing Dormin of waiting for an opportune moment (i.e., the moment when the Manhattan office was being renovated) to retaliate against Kent-Friedman, fails to put forward any significant evidence "from which the length of delay may be gleaned." Williams v. Westchester Med. Ctr. Health Network, No. 21 Civ. 3746, 2022 WL 4485296, at *18 (S.D.N.Y. Sept. 27, 2022).[18] Accordingly, NYSIF's motion is **GRANTED** with respect to Count Two.

### 2.   NYHRL and NYCHRL

Count Eight, styled as both an NYHRL and NYCHRL claim, must be dismissed, as well. To the extent that Count Eight is a NYHRL claim, it is decided according to the same standards as the Title VII claim, which must be dismissed in light of

---

[18] Kent-Friedman makes mention of an episode postdating (by as many as eleven months) her loss of the Manhattan workspace. When the Melville office also underwent renovations, DCI relocated from the second floor of its building to the first floor. (See Pl. 56.1 Resp. ¶ 225.) In late November of 2018, Kent-Friedman inspected the first-floor office space to which DCI would be moving; construction of the space was still underway. (See Email from Alison Kent-Friedman, dated Nov. 29, 2018, Dkt. No. 154-9.) Kent-Friedman complained to Dormin that it appeared she was going to be placed in a windowless office and that other attorneys were going to be placed in larger offices with windows. (See id.) After she complained, Kent-Friedman received an office with windows; she was never moved to the windowless office. (See Pl. 56.1 Resp. ¶ 232.) To the extent that this evidence is probative of whether Dormin intended nearly a year earlier to retaliate against Kent-Friedman for making an EEOC complaint that itself was filed more than six months before that, it cannot support a reasonable jury finding of causation by a preponderance of the evidence, even when considered in conjunction with the temporal proximity between the EEOC charge and the alleged retaliation. See Anderson, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

the above discussion. See Syeed v. Bloomberg L.P., 568 F. Supp. 3d 314, 343 (S.D.N.Y. 2021) (stating that for claims accruing before August 19, 2019, standards under NYHRL are generally the same that apply under Title VII). The Court will thus construe it as an NYCHRL claim.

Compared to Title VII, the NYCHRL provides broader protection to plaintiffs of discrimination and retaliation claims, see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013), but it is not broad enough to save Kent-Friedman here. Under the NYCHRL, Kent-Friedman does not need to show but-for causation; she need only show that the allegedly retaliatory action "was caused at least in part by retaliatory motives." Hatzimihalis v. SMBC Nikko Sec. Am., Inc., 20 Civ. 8037, 2023 WL 3764823, at *13 n.17 (S.D.N.Y. June 1, 2023). As explained above, however, Kent-Friedman has put forward no significant evidence of causation other than a temporal gap of about six months between Dormin's awareness of her EEOC charge and the allegedly retaliatory actions. See Moore v. Verizon, No. 13 Civ. 6467, 2016 WL 825001, at *15 (S.D.N.Y. Feb. 5, 2016) (stating that four-month temporal gap could not support inference of retaliation under NYCHRA). The Court thus **GRANTS** summary judgment to the Individual Defendants with respect to Count Eight.

D.   THE FAILURE-TO-PROMOTE CLAIMS

Count One of the Complaint alleges that NYSIF discriminated against Kent-Friedman on the basis of sex in violation of Title VII by failing to promote her to DCI Director or Assistant DCI Director despite her qualification for those positions. (See Compl. ¶ 162.)[19] Counts Six and Seven allege sex discrimination in violation of NYHRL and NYCHRL, respectively. (See Compl. at 28–29.)

The Court begins with the Title VII claim. Such claims proceed according to a familiar three-step evidentiary framework. First, to establish a prima facie case of discriminatory failure to promote, Kent-Friedman must show that "(1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued

---

[19] Count One of the Complaint is framed as both a failure-to-promote claim and a disparate pay claim. (See Compl. ¶ 162.) Kent-Friedman's brief implicitly accepts the framing of the claim as a failure-to-promote claim, as its section on Title VII discrimination devotes one sentence, at most, to disparate pay. (See Pl. Mem. at 23.) The Court thus treats the claim the way the parties framed it. Cf. Person v. Google, Inc., 456 F. Supp. 2d 488, 492 (S.D.N.Y. 2006) ("[T]he issue will be considered under Fed. Civ. P. Rule 12(b)(3) because that is how it was framed by the parties.") In any event, to the extent Count One could be framed as a disparate pay claim, it would be to some extent duplicative of the EPA claim. See Fisher v. Vassar College, 852 F. Supp. 1193, 1234 (S.D.N.Y. 1994) (stating that plaintiff who proved Title VII and Equal Pay Act claims had to choose "under which theory she desires to recover"), rev'd on other grounds, 114 F.3d 1332 (2d Cir. 1997); Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 956–57 (1st Cir. 1995) (explaining how trial court reduced Title VII award by amount of Equal Pay Act award).

to seek applicants having the plaintiff's qualifications." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)).

A plaintiff is excused from the second element's application requirement "if she demonstrates that the vacancy was not posted and that the plaintiff either did not know about the vacancy or tried to apply through informal procedures endorsed by the employer." *Pollock v. Shea*, 568 F. Supp. 3d 500, 508 (S.D.N.Y. 2021). Moreover, "[t]he usual formulation of the fourth element . . . obviously does not apply when the position has been filled. In such cases, the Second Circuit applies the more generic formulation — whether 'the circumstances of the [failure to promote] give rise to an inference of discrimination.'" *Martinez v. Davis Polk & Wardwell LLP*, 208 F. Supp. 3d 480, 486 (E.D.N.Y. 2016) (alteration in original) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003)).

The second step in the Title VII evidentiary framework provides that if the plaintiff establishes her prima facie case, "the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Aulicino*, 580 F.3d at 80 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "To satisfy this burden,

'the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" Knight v. Nassau Cnty. Civ. Serv. Comm'n, 649 F.2d 157, 161 (2d Cir. 1981) (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 257 (1981)).

The final step in the Title VII framework is that if the defendant meets its second-step burden, the plaintiff must, to defeat summary judgment, "show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Aulicino, 580 F.3d at 80 (quoting Terry, 336 F.3d at 138). In other words, the plaintiff's showing must be sufficient to allow a reasonable jury to conclude by a preponderance of the evidence that the defendant's "proffered reasons are unworthy of belief or merely pretextual." Knight, 649 F.2d at 161.

1.   Prima Facie Case

NYSIF first argues that Kent-Friedman cannot establish a prima facie failure-to-promote case under Title VII because she did not apply for the DCI Director or Assistant DCI Director positions during the limitations period. NYSIF did not publicly post for the DCI Director position before hiring

58

Dormin in September 2016 (see Pl. 56.1 Resp. ¶ 123), so Kent-Friedman did not apply for that job opening. And Kent-Friedman most recently applied for Assistant Director in July 2015, before the limitations period. (See Compl. ¶ 102; Defs. 56.1 Resp. ¶ 280.)[20]

With respect to the Assistant Director position, the Court agrees that Kent-Friedman cannot establish a prima facie case. Kent-Friedman argues that she satisfies the application requirement because she told Dormin soon after he started at NYSIF in September 2016 that she wanted to be permanently appointed as Assistant DCI Director. (See Pl. Mem. at 13; Defs. 56.1 Resp. ¶ 294.) But even if that is correct, she cannot meet the fourth element, which requires her to show that "the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." Aulicino, 580 F.3d at 80. As Kent-Friedman admits, the Assistant Director position was not permanently filled at any time after 2010. (See Pl. 56.1 Resp. ¶¶ 63, 111.) The Chief of Investigations line item previously associated with the Assistant DCI Director role remained

---

[20] A Title VII plaintiff in New York has 300 days from the time of the alleged discrimination to file a charge with the EEOC; if she fails to timely file with the EEOC, her federal claim is time-barred. See Boyle v. McCann Erickson, Inc., 949 F. Supp. 1095, 1106 (S.D.N.Y. 1997). Kent-Friedman filed her EEOC complaint on March 3, 2017, so claims arising from alleged discrimination predating May 2016 are untimely.

empty between 2010 and 2018, and Kent-Friedman acknowledges in her motion papers that the Chief of Fraud Prevention job, to which the Chief of Investigations line item was assigned in 2018, is a "different role" than Assistant Director. (See Pl. Mem. at 23.)

As for the DCI Director position, the Court comes to a different conclusion. Viewing the record in a light favorable to Kent-Friedman, a reasonable jury could find that she "did not know about the vacancy," Pollock, 568 F. Supp. 3d at 508, based on the facts that NYSIF did not publicly post for the DCI Director position before hiring Dormin and that Dormin was the only person interviewed for the job. (See Madoff Dep. at 96:8-12, 98:15-18.) Kent-Friedman thus could establish at a trial that, for the purposes of her prima facie case, she is excused from showing that she formally applied for the DCI Director position.

In their reply brief, NYSIF argues for the first time that even if Kent-Friedman did not have to apply for the position, she still cannot establish the fourth element of the prima facie case (see Reply Mem. at 8), but Defendants cite no legal authority or evidence to support this proposition. Because the DCI Director position did not remain open and was filled by Dormin, the fourth element is whether the circumstances of the failure to promote Kent-Friedman

give rise to an inference of discrimination. See Martinez, 208 F. Supp. 3d at 486.

Even if NYSIF had not waived this issue, see Fisher v. Kanas, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007) (stating that arguments raised for the first time in a reply brief are waived), the Court would decline to grant NYSIF summary judgment on this ground. See, e.g., Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000) (stating that Title VII failure-to-promote plaintiff's summary judgment burden at the prima facie stage is not onerous); Wesley v. Arlington County, 354 F. App'x 775, 778 (4th Cir. 2009) (per curiam) ("[W]e have held that the fourth element, 'an inference of unlawful discrimination,' is satisfied where a position is filled by an applicant outside the protected class." (quoting Carter v. Ball, 33 F.3d 450, 455 (4th Cir. 1994))); Concepcion v. City of New York, No. 15 Civ. 2156, 2016 WL 386099, at *14 (S.D.N.Y. Jan. 29, 2016) (same), aff'd, 693 F. App'x 31 (2d Cir. 2017) (summary order). The burden therefore shifts to NYSIF, which must "offer a legitimate, non-discriminatory rationale" for not hiring Kent-Friedman as DCI Director. Aulicino, 580 F.3d at 80.

2.   Legitimate, Nondiscriminatory Rationale

NYSIF argues that it "had multiple legitimate, non-discriminatory reasons" for declining to promote Kent-Friedman to DCI Director and hiring Dormin instead. (Defs. Mem. at 13.) It points to (i) Dormin's embrace of the DCI policy changes sought by Madoff's administration, (ii) Madoff's impression that Kent-Friedman did not endorse these changes, (iii) the endorsement of Dormin by the Inspector General's office in light of the strained relationship between that office and DCI, and (iv) Dormin's credentials and previous management experience. (See id. at 13–14.)

The Court agrees that this evidence would be sufficient for a jury to conclude that the decision to hire Dormin as DCI Director was not motivated by discriminatory animus. See Knight, 649 F.2d at 161; Davis v. State Univ. of N.Y., 802 F.2d 638, 641 (2d Cir. 1986) (stating that to rebut prima facie case, employer "need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory"). The Court thus proceeds to the final step in the three-part Title VII framework.

### 3.   Pretext

The question whether Kent-Friedman's failure-to-promote claim survives summary judgment ultimately turns on whether a reasonable jury could infer that NYSIF's decision to hire Dormin rather than Kent-Friedman as DCI Director was more likely than not based wholly or partially on discrimination. Aulicino, 580 F.3d at 80. Put differently, the question is whether a jury could rationally conclude by a preponderance of the evidence that NYSIF's proffered reasons for hiring Dormin are unworthy of belief or merely pretextual. Knight, 649 F.2d at 161. If the answer is yes, summary judgment is improper.

Although this is a close case, the Court declines to grant summary judgment to NYSIF on the failure-to-promote claim. A jury finding in favor of Kent-Friedman on this claim would be reasonable for two main reasons: (a) NYSIF's explanations for hiring Dormin are mostly unsupported, or in some cases potentially undermined, by contemporaneous evidence, and (b) Kent-Friedman has set forth other evidence on which a jury could base a reasonable inference that NYSIF discriminated against her.

a. ***Lack of contemporaneous evidence***

i.   *Dormin's supposed embrace of policy change*

NYSIF contends that its leadership "recommended Dormin as DCI Director based on his management experience, as well as his willingness to embrace the new direction of DCI, inclusive of its focus on data analytics." (Defs. Mem. at 14.) NYSIF cites to the following portion of the transcript of Madoff's deposition:

> Q: Did Mr. Dormin have experience in the Department of Labor in fraud detection using data analytics?
>
> A:  I'm not sure to what extent they used data analytics at the Department of Labor. I don't have a specific recollection about that. But I do remember talking to John about that being a direction that we wanted to go in. And he was enthusiastic about that and very supportive of it . . . .

(Madoff Dep. at 95:19-96:5.)

The contemporaneous evidence, however, makes no mention of a focus on data. The Request for Personnel Action form submitted on behalf of Dormin states only that he "interviewed well and possesses the skills, abilities, and experience necessary for this position." (See Dormin Personnel Action Form.) And in its EEOC Position Statement, NYSIF wrote that the "sole reason" Dormin was hired was that his "experience and leadership far outweigh that of Ms. Kent-Friedman," with no mention of data analytics. (See Position Statement at 10.)

Moreover, Dormin testified that he had no certifications or professional qualifications in data analytics. (See Dormin Dep. at 91:21-25.) Dormin said he believed he had "attended a class or two on the use of data analytics," but he could not provide any details about the classes and could not say whether he attended them before or after he started at DCI. (See id. at 92:2-93:18.) And he acknowledged during his deposition that his résumé did not refer to data analytics. (See id. at 254:9-255:11.) Given the lack of contemporaneous evidence that Dormin had experience in data analytics, a reasonable jury might doubt whether Dormin's embrace of a data-driven vision was a real reason for his selection as DCI Director.

  ii.  *Kent-Friedman's alleged resistance to policy change*

NYSIF also argues that its decision to hire Dormin rather than Kent-Friedman was justified, in part, by Kent-Friedman "ma[king] it known that she disagreed with the changes sought by Madoff's administration." (Defs. Mem. at 14.) To support this claim, NYSIF cites to Kent-Friedman's statement during her deposition that she "expressed reservations to Mr. Dormin" about the new "process of taking cases to the [Workers' Compensation] Board first before referring them[] for criminal prosecution." (Pl. Dep. at 326:18-327:4.) But a statement Kent-Friedman made to Dormin after Dormin was hired

is not significantly probative with respect to NYSIF's decision to hire Dormin in the first place.

NYSIF also cites to Madoff's deposition statement that Kent-Friedman "made it clear . . . that she didn't like the direction that we were going in and didn't support it and didn't believe in it." (Madoff Dep. at 79:4-9.) But when he was asked how he came to that conclusion, Madoff answered that he did not "have a specific . . . order of events to answer that," and Madoff could not identify any documentation supporting his characterization of Kent-Friedman. (Id. at 79:2-23.) He further testified that he could not recall ever having a one-on-one meeting with Kent-Friedman. (See Defs. 56.1 Resp. ¶ 303.) A reasonable jury could thus be skeptical of whether Kent-Friedman's attitude was what truly kept her from being promoted to DCI Director.

iii. *The Inspector General's endorsement of Dormin*

NYSIF argues that perhaps the "most compelling" reason for it to hire Dormin was "that Dormin was recommended by the Inspector General's Office — the very office that had complained to Madoff regarding DCI's lack of cooperation." (Defs. Mem. at 14.) NYSIF says it had a "need and desire to repair this critical business relationship." (Id.) The evidence that Dormin was endorsed by the Inspector General's

office consists of deposition testimony from Madoff that Leahy Scott suggested Dormin to him as a good candidate for DCI Director. (See Madoff Dep. at 93:5-17.) But the Leahy Scott statement, being hearsay (see Fed. R. Evid. 802), would not be admissible at trial for its truth, as NYSIF implicitly acknowledges on reply. (See Reply Mem. at 9.)

b. *Evidence supporting an inference of discrimination*

Kent-Friedman sets forth additional evidence that could support a reasonable inference that NYSIF discriminated against her. First, as of the date the Complaint was filed, no woman had ever held the position of DCI Director or Assistant DCI Director. (See Answer ¶ 150.) A jury may properly rely on this fact in deciding whether NYSIF discriminated against Kent-Friedman. See Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 76-78 (2d Cir. 2016) (stating that in pretext inquiry, finder of fact could consider fact that no woman had ever been a bricklayer).

Second, Kent-Friedman points to Cusick's statement that he recommended hiring Tidona, Dormin's predecessor as DCI Director and Kent-Friedman's competition for the job in 2013-14, because he was "the kind of guy that we want to see at the top of DCI." (Pl. Mem. at 18 (emphasis removed).) Kent-Friedman characterizes Cusick's statement as "direct evidence

of sex discrimination and a preference for male leaders in DCI." (Id.) Whether the statement is characterized as direct or circumstantial evidence, the Court agrees that a jury could reasonably rely on it in concluding that NYSIF's proffered reasons for hiring Dormin are pretextual.

In Vance v. Union Planters Corp., 209 F.3d 438 (5th Cir. 2000), the court considered a similar testimonial remark. The plaintiff in Vance alleged discriminatory failure to promote on the basis of sex after Union Planters Bank official Pat Davis declined to hire her as president of a bank branch and chose a male candidate instead. See 209 F.3d at 439-40. At trial, Davis was asked why he continued to solicit male candidates when it appeared that the plaintiff was the only qualified applicant, and he answered that he wanted to hire "the best guy, the best person, and I saying [sic] that generically." Id. at 440 (alteration in original). The plaintiff argued that this testimony was a "Freudian slip" that "evinced Davis's desire to hire a male." Id. at 442. The defense argued that the remark "was merely a slip of the tongue." Id. The Fifth Circuit held that the comment was "susceptible to either construction" and noted that in Title VII lawsuits, "the employer is rarely going to concede unambiguously that it intended to violate the law." Id. at 443.

Here, too, a jury could properly conclude either that Cusick's remark was a relatively meaningless slip of the tongue or that it was probative of a discriminatory atmosphere at NYSIF that contributed to its failure to promote Kent-Friedman. See Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 253-54 (S.D.N.Y. 1999) (Sotomayor, C.J.) ("[C]omments by high-ranking officials . . . are admissible as circumstantial evidence suggesting that there is a particular (discriminatory) corporate atmosphere in which decisions are made."); Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 274-75 (E.D.N.Y. 2013) (same).

Third, Kent-Friedman points out that NYSIF's Position Statement responding to her EEOC charge states that Dormin's superior "experience and leadership" was the "sole reason" he was chosen over Kent-Friedman and makes no mention of the Inspector General or of data analytics. (See Pl. Mem. at 15; Position Statement at 10.) A jury may properly use any inconsistency between NYSIF's EEOC Position Statement and its position in this lawsuit to conclude that NYSIF's proffered reasons for hiring Dormin are pretextual. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846-47 (2d Cir. 2013) (stating that discrepancy between EEOC Position Statement and later testimony could support inference that employer's explanation for employee's termination was pretextual).

Finally, there is evidence that when it hired Dormin, NYSIF departed from its previous practice of advertising for the DCI Director and Assistant DCI Director positions. (See Position Statement at 8-10; Vacancy Notice; Pl. 56.1 Resp. ¶ 110.) This, too, is evidence a jury could reasonably use to conclude that NYSIF's proffered reasons are pretextual. See Bucknell v. Refined Sugars, Inc., 82 F. Supp. 2d 151, 158 (S.D.N.Y. 2000) (stating that a "failure to follow an organization's stated policies or routine procedures can be evidence of pretext" (quoting Stern v. Trs. Of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997))); Adorno v. Port Authority, 258 F.R.D. 217, 232 (S.D.N.Y. 2009) (denying summary judgment motion where plaintiffs "present[ed] evidence of unstructured and inconsistent promotions procedures marked by a lack of documentation").

c. *Dormin's and Kent-Friedman's respective qualifications*

The Court lastly turns to NYSIF's reliance on Dormin's "stellar credentials." (Defs. Mem. at 14.) Prior to joining NYSIF, Dormin was an assistant district attorney in Manhattan for fifteen years, an assistant attorney general on New York's Organized Crime Task Force for four years, and the executive director of the state Department of Labor's Office of Special Investigations for approximately nine years. (See Pl. 56.1

Resp. ¶ 43.) Dormin testified that in the latter position, he supervised investigations into allegations of fraud against the Department of Labor and the Workers' Compensation Board. (See id. ¶ 46.)

It would be improper, given the evidence outlined above, for the Court to grant summary judgment to NYSIF solely based on Dormin's qualifications. See Walsh, 828 F.3d at 76 (stating that district court must, at the third step of the Title VII burden-shifting analysis, view the evidence "as a whole rather than in a piecemeal fashion"). It is the province of the jury to decide whether and how much to credit NYSIF's statement (see Position Statement at 10) that Dormin was hired because the quality of his previous experience far outweighed the quality of Kent-Friedman's. Cf. Mandell, 316 F.3d at 379 ("Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury.").

This is especially so given that Kent-Friedman served apparently without incident as Acting DCI Director. NYSIF does not argue that her performance in that role was in any way inadequate. When Kent-Friedman was announced as Acting DCI Director in 2013, then-Acting NYSIF Executive Director Dorothy Carey described Kent-Friedman as "a consummate professional who has worked with staff from all NYSIF departments and district attorneys' offices throughout the

71

state to bring successful fraud cases to conclusion." (Email, dated June 20, 2013, between Colleen Gardner, Dorothy Carey, and Peter Cusick, Dkt. No. 153-13; see Pl. 56.1 Resp. ¶ 68.) Other courts have denied summary judgment motions under similar circumstances. See Wesley, 354 F. App'x at 779-80, 783 (reversing grant of summary judgment where plaintiff "served as an acting captain on numerous occasions . . . thus demonstrating she could in fact perform the duties required of the position"); Ham v. Wash. Suburban Sanitary Comm'n, 158 F. App'x 457, 464-74 (4th Cir. 2005) (reversing grant of summary judgment where plaintiffs served as Acting Lead Tech but were denied promotions to Lead Tech).

Kent-Friedman argues that NYSIF treated her as "[a] seat-warmer for men." (Pl. Mem. at 1.) The Court today does not decide whether this characterization is accurate. It holds only that Kent-Friedman can present her theory to a jury. Accordingly, NYSIF's motion is **DENIED** with respect to Count One.

4.   <u>Individual Liability Under NYHRL and NYCHRL</u>

The only remaining question is whether the Individual Defendants can be held liable under corresponding provisions of state law, i.e., under NYHRL and NYCHRL. Defendants argue (see Defs. Mem. at 17) that with respect to NYHRL, Kent-

Friedman cannot establish aider-and-abettor liability because she has not produced evidence that the Individual Defendants "actually participated in the conduct giving rise to the claim of discrimination" and "share[d] the intent or purpose of the principal actor," here NYSIF. <u>Griffin v. Sirva Inc.</u>, 835 F.3d 283, 293 (2d Cir. 2016) (quoting <u>Idlisan v. N.Y. State Dep't of Tax'n & Fin.</u>, No. 12 Civ. 1787, 2013 WL 2898050, at *4-5 (N.D.N.Y. June 13, 2013)).

With respect to Dormin, the Court agrees. The Court has concluded above that Kent-Friedman cannot establish a prima facie case that NYSIF unlawfully failed to promote her to the Assistant Director position, and with respect to the Director position, it is axiomatic that Dormin cannot be held liable for unlawfully hiring Dormin rather than Kent-Friedman.[21]

The Court also finds that on this record, no reasonable jury could conclude that O'Brien or Mullen intended to discriminate against Kent-Friedman or actually participated in discrimination. Though O'Brien sat in on Dormin's job interview (<u>see</u> Dormin Dep. at 42:10-20), Kent-Friedman makes no arguments and presents no evidence specifically

---

[21] Kent-Friedman would be unable to make a prima facie failure-to-promote case with respect to the Assistant Director position even under the more plaintiff-friendly standards of the NYCHRL. <u>See</u> <u>Syeed</u>, 568 F. Supp. 3d at 340 (using same four-element prima facie test under NYCHRL as is used under Title VII).

implicating him in any employment decision.[22] Similarly, although Mullen completed and signed the Request for Personnel Action form requesting that Dormin be appointed as DCI Director (see Dormin Personnel Action Form), there is no evidence that he was responsible for choosing Dormin for the job and thus that completing the form was anything other than a ministerial task.[23] Thus, the Court will **GRANT** the Individual Defendants' motion with respect to Dormin, O'Brien, and Mullen on Count Six and Count Seven.

The Court is not persuaded, however, that summary judgment on the NYHRL discrimination claim is appropriate with respect to Madoff or Cusick. Both men sat in on Dormin's job interview. (See Dormin Dep. at 42:10-20.) Madoff testified that although he would not have hired Dormin "without support from the people that he was going to be reporting to," he was "ultimately responsible" for hiring Dormin, adding that "the buck stop[s] . . . with me." (Madoff

---

[22] Kent-Friedman argues that Cusick's "this is the kind of guy that we want" statement regarding Tidona meant that Tidona was "the kind of guy" that Cusick *and O'Brien* wanted (see Pl. Mem. at 18), but the deposition transcript makes no mention of O'Brien and thus does not support this interpretation. (See Dkt. No. 164-8.)

[23] With respect to O'Brien and Mullen, the same reasoning applies under the NYCHRL, even in light of that law's broader protections for plaintiffs in discrimination cases and its jurisdiction over employees in addition to employers and aiders and abettors. Kent-Friedman simply has not provided enough evidence for a reasonable jury to conclude that O'Brien or Mullen personally joined in discrimination on the basis of sex. See Griffin, 835 F.3d at 293.

Dep. at 94:7-19.)[24] Moreover, Cusick's "this is the kind of guy that we want" testimony not only is probative of a potentially discriminatory attitude but also suggests that he has had influence over the selection of the DCI Director in the past. Such influence would be consistent with the undisputed fact that Cusick was the NYSIF executive responsible for overseeing DCI during the relevant period and to whom the DCI Director reported. (See Pl. 56.1 Resp. ¶¶ 34, 42.) Lastly, as explained above, a reasonable jury would be entitled to be skeptical of Madoff's testimony that Kent-Friedman was not supportive of his vision for DCI.

Given this evidence, the Court cannot say that no reasonable jury could find that Madoff and Cusick "actually participated in the conduct giving rise to the claim of discrimination" and "share[d] the intent or purpose of the principal actor." Griffin, 835 F.3d at 293 (quoting Idlisan, 2013 WL 2898050, at *4-5). The Court therefore **DENIES** the Individual Defendants' motion with respect to Madoff and Cusick on Count Six.

Finally, the Individual Defendants do not respond to Kent-Friedman's argument that they can be held directly

---

[24] O'Brien testified to similar effect. When asked during his deposition why Dormin was hired as DCI Director, O'Brien said, "[Y]ou'd have to ask Eric [Madoff] that because that was his decision." (See Deposition of William O'Brien, dated Mar. 18, 2021, Dkt. No. 153-7, at 84:4-7.)

liable as employees under the NYCHRL given the plain language of the provision. (See Pl. Mem. at 23; Reply Mem. at 16–17.) The NYCHRL provides that it is unlawful for "an employer *or an employee or agent thereof*" to engage in employment discrimination on the basis of gender. N.Y.C. Admin. Code § 8-107(1)(a) (emphasis added). The Court has just noted the evidence upon which a jury could reasonably conclude that Madoff and Cusick participated in unlawfully failing to promote Kent-Friedman because of her gender. Accordingly, the Court **DENIES** the Individual Defendants' motion with respect to Madoff and Cusick on Count Seven.

## IV.  <u>ORDER</u>

For the foregoing reasons, it is hereby

**ORDERED** that the motion (the "Motion") filed by defendants New York State Insurance Fund, Eric Madoff, William O'Brien ("O'Brien"), Peter Cusick, Joseph Mullen ("Mullen"), and John Dormin ("Dormin") for summary judgment (Dkt. No. 152) dismissing the Amended Complaint (Dkt. No. 41) is **GRANTED** as to Counts Two, Five, and Eight; and it is further

**ORDERED** that the Motion is **GRANTED**, with respect to Dormin, O'Brien, and Mullen only, as to Counts Six and Seven; and it is further

**ORDERED** that the Motion is **DENIED** in all other respects.

**SO ORDERED.**

Dated:     27 September 2023
           New York, New York


                                    _____
                                         Victor Marrero
                                            U.S.D.J.